UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
JOHN ROE,

                              Plaintiff,                              **COMPLAINT**

     -against-

CHAPPAQUA CENTRAL SCHOOL DISTRICT,      **PLAINTIFF DEMANDS**
BOARD OF EDUCATION OF THE CHAPPAQUA     **A TRIAL BY JURY**
CENTRAL SCHOOL DISTRICT, JOHN CHAMBERS,
Former Interim Superintendent, LYN MCKAY, Superintendent,
ANDREW SELESNICK, former Principal, ROBERT
RHODES, Principal, THOMAS CARDELLICHIO, former
Title IX Compliance Officer, PAUL CITARELLA, former
Title IX Compliance Officer and CHRISTOPHER
SCHRAUFNAGEL, former Teacher, in their official and
individual capacities.

                             Defendants.
------------------------------------------------------------------------x

        Plaintiff JOHN ROE, by his attorneys, ASHER, GAUGHRAN LLP, respectfully alleges:

## INTRODUCTION

        1.     John Roe, a graduate of Horace Greeley High School ("HGHS") in Chappaqua,

New York, was sexually and emotionally abused, and sexually harassed, by the high school's

theater teacher and Performing Arts Department Chairperson Christopher M. Schraufnagel

("Schraufnagel"), over the course of five years. As a result of a pattern and practice of pervasive

sexual abuse against Plaintiff and at least six other HGHS students, Schraufnagel has been

charged by the Westchester County District Attorney with one felony count of third-degree

criminal sex act and six misdemeanor counts: two of endangering the welfare of a child and four

of third-degree sexual abuse.

2.      This activity took place from September 2010 through June 2015 at Defendant Chappaqua Central School District's Horace Greeley High School ("HGHS"), and in connection with off-campus HGHS-sanctioned school activities.

3.      In addition, there are multiple legal actions and applications pending on behalf of six other HGHS students against Schraufnagel and the Chappaqua Central School District in New York State Supreme Court regarding this behavior. In each of these proceedings, the plaintiffs are proceeding anonymously.

4.      The outrageous conduct of Schraufnagel includes, without limitation, subjecting John Roe to sexual abuse on school grounds, routinely engaging in sexually explicit conversations with his students,  conducting alcohol and drug-fueled  HGHS theater field trips to New York City that included John Roe, and leading HGHS students on an international school trip to Greece, during which these underage students, including John Roe, were directed by Schraufnagel to engage in sexual encounters with the teacher and with one another.

5.      At all times alleged herein, all of the individual Defendants were acting under color of state law.

6.      The years of abuse of Plaintiff John Roe were made possible by the willful indifference of the Chappaqua Central School District ("CCSD") to the well-being of its students.

7.      For the pertinent time period, Schraufnagel was permitted, if not encouraged, by the CCSD to create a wholly self-contained, unscrutinized world on the HGHS campus where students were exposed to a steady stream of abusive and depraved behavior.

8.      Left entirely to his own devices, Schraufnagel constructed an unmonitored, cult-like atmosphere where children were left to fend for themselves against his predations.

9.      Despite warnings and complaints that should have prompted investigation and oversight, the CCSD let Schraufnagel preside over a drug-, sex- and alcohol-driven world without adults, where children competed for their teacher's approval by trying to outdo each other in emulating their depraved teacher.

10.     The District's willful indifference to John Roe's right to attend school with his bodily integrity intact, in an environment free of sexual harassment, led to the years of abuse by Schraufnagel that he suffered as a HGHS student.

11.     John Roe brings the instant action pursuant to 42 U.S.C. § 1983, alleging that his right to bodily integrity as guaranteed by the Fourteenth Amendment was violated by all of the Defendants.  He further alleges that all Defendants violated his right to an equal treatment under the law as guaranteed by the Equal Protection Clause of the Fourteenth Amendment. In addition, he alleges sexual discrimination arising under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 *et seq.* ("Title IX").

## JURISDICTION AND VENUE

12.     Jurisdiction is present under 28 U.S.C. § 1331 and 28 U.S.C. § 1342.

13.     Venue is proper in the Southern District of New York pursuant to 18 U.S.C. § 1965 (c) and 28 U.S.C. § 1391(b), because the claims arose in this District and a number of the Defendants reside in, transact business in, or maintain a principal place of business in Westchester County.

## PARTIES

14.     Plaintiff John Roe, an adult resident of Westchester County in the State of New York, was born on September 14, 1995.

15.     At all times relevant to this Complaint, the Plaintiff resided in the hamlet of Chappaqua, in the town of New Castle, New York, within the geographical boundaries of the Defendant's school district zone.

16.     John Roe attended the CCSD's schools from the second grade through the date of his graduation in June 2013.

17.     From September 2009 through June 2013, the Plaintiff was a student attending HGHS in the Chappaqua Central School District.

18.     Plaintiff is referred to by a pseudonym throughout this Complaint to preserve his confidentiality. He was a minor at the time of the incidents complained of, and would be likely to suffer harmful psychological and emotional consequences if he were forced to identify himself; the litigation involves matters that are highly sensitive and of a personal nature; and the nature of the charged acts is so extreme as to support sufficiently an interest in anonymity.  There is no prejudice to the Defendants as they have been independently notified of the true identity of the Plaintiff.

19.     Defendant Chappaqua Central School District ("CCSD" or "the District") was and is a municipal corporation and local educational agency which maintains its principal place of business at 66 Roaring Brook Road, Chappaqua, New York 10514, in Westchester County.

20.     The CCSD is an educational institution receiving federal financial assistance as defined in 20 U.S.C. § 1681(c).

21.     At all times relevant to this Complaint, the CCSD owned, operated, controlled, administered and maintained the HGHS, which is also located at 66 Roaring Brook Road, Chappaqua, New York 10514, in Westchester County.

22.     At all times relevant to this Complaint, Defendant Board of Education of the CCSD was and is a public benefit corporation, duly organized and existing by virtue of the laws of the State of New York, which maintains its principal place of business at 66 Roaring Brook Road, Chappaqua, New York 10514, in Westchester County.

23.     Pursuant to the New York Education Law § 2503, the CCSD Board of Education is charged with, *inter alia*: "Prescrib[ing]such regulations and by-laws as may be necessary to make effectual the provisions of this chapter and for the conduct of the proceedings of said board and the transaction of its business affairs, for the general management, operation, control, maintenance and discipline of the schools, and of all other educational, social or recreational activities and other interests under its charge or direction."

24.     In this capacity, the CCSD Board of Education bears a fiduciary responsibility to the CCSD, and is required to oversee the management of the District to ensure its assets are used properly, that the school's policies comply with all relevant laws and regulations, and that these policies are implemented at the school.

25.     Defendant John Chambers ("Chambers") was the Interim Superintendent of the CCSD from July 1, 2009 to July 1, 2011, during the Plaintiff's ninth and tenth grade years at the high school.

26.     As Interim Superintendent, Chambers was the chief executive officer of Chappaqua Central School District, and was chiefly responsible for managing the day-to-day operations of the CCSD. Chambers was responsible for developing administrative regulations to implement the policies established by the Board of Education; for the overall planning, direction, control and evaluation of District activities; and (according to the CCSD website) "for managing

these activities aggressively and imaginatively so as to maintain and improve the quality of the District through continuous school improvement initiatives."

27.     During his term, the Interim Superintendent was required to enforce all provisions of laws, rules and regulations relating to the management of the CCSD, to operate and manage the District, and manage the allocation of resources District-wide.

28.     Chambers had the authority to implement corrective measures on the CCSD's behalf for violations of Title IX.  His responsibilities included creating, implementing and correcting policies under Title IX, to avoid and eliminate sexual harassment within the academic and extra-curricular programs at the CCSD.

29.     Defendant Lyn McKay ("McKay") was appointed the Superintendent of the CCSD on July 1, 2011, commencing in the Plaintiff's eleventh grade year, and remains the school superintendent to date.

30.     As Superintendent, McKay is the chief executive officer of the CCSD, and is chiefly responsible for managing the day to day operations of the CCSD. McKay is responsible for developing administrative regulations to implement the policies established by the Board of Education; for the overall planning, direction, control and evaluation of District activities; and (according to the CCSD website) "for managing these activities aggressively and imaginatively so as to maintain and improve the quality of the District through continuous school improvement initiatives."

31.     Superintendent McKay is required to enforce all provisions of laws, rules and regulations relating to the management of the CCSD, to operate and manage the school district, and manage the allocation of resources District-wide.

32.     McKay had and continues to have the authority to implement corrective measures on CCSD's behalf for violations of Title IX.  Her responsibilities include creating, implementing and correcting policies under Title IX, to avoid and eliminate sexual harassment within the academic and extra-curricular programs at the CCSD.

33.     Defendant Andrew Selesnick ("Selesnick") was appointed Principal of the CCSD's HGHS on July 1, 2003 and served in that position through June 30, 2012, the end of Plaintiff's eleventh grade year.

34.     From July 1, 2012 through June 30, 2015, Selesnick also served as the CCSD's Title IX Compliance Officer.

35.     He currently serves as the Superintendent of the neighboring Katonah-Lewisboro School District.

36.     In his role as HGHS Principal, Selesnick was the highest ranking District employee in the high school. He was responsible for the safety of students and staff in his building and supervised the high school's teachers and staff.

37.     Defendant Robert Rhodes ("Rhodes") was appointed the Principal of HGHS on July 1, 2012, and continues to serve the CCSD in that capacity to date.

38.     In his role as HGHS Principal, Rhodes is the highest ranking District employee in the high school. He is responsible for the safety of students and staff in his building and supervises the high school's teachers and staff.

39.     From July 1, 2010 through June 30, 2011, Thomas Cardellichio served as the CCSD's Title IX Compliance Officer.

40.     From July 1, 2011 through June 30, 2012, Paul Citarella served as the CCSD's Title IX Compliance Officer.

41.     From July 1, 2012 through June 30, 2015, Andrew Selesnick served as the CCSD's Title IX Compliance Officer.

42.     As Title IX Compliance Officers from July 1, 2010 through June 30, 2015, Selesnick, Cardellichio and Citarella were respectively responsible for ensuring that the CCSD was in compliance with Title IX's administrative requirements; that they were each individually knowledgeable about CCSD's policies and procedures on sex discrimination, and that the CCSD's policies and procedures were drafted and revised to ensure their compliance with the requirements of Title IX.

43.     Their responsibilities as Title IX Compliance Officers included educating the school community on how to file a complaint alleging a violation of Title IX, investigating Title IX complaints, working with law enforcement when necessary, and ensuring that complaints were resolved promptly and appropriately to help prevent incidents from recurring or becoming systemic problems.

44.     The CCSD's Title IX Compliance Officers also bear responsibility for assisting the CCSD in developing a method to survey the school climate, and for coordinating the collection and analysis of information from that survey.

45.     The CCSD's Title IX Compliance Officers are required to provide training and technical assistance on school policies related to sex discrimination and develop programs, such as school assemblies, on issues related to Title IX to ensure that all members of the school community, including students and staff, are aware of their rights and obligations under Title IX, and should regularly assess the adequacy of current training opportunities and programs and propose improvements as appropriate.

46.     At all times relevant to this action, Defendant Christopher Schraufnagel was a tenured speech and theater teacher at Defendant CCSD's high school.

## THE CCSD GRANTED SCHRAUFNAGEL EXCLUSIVE, UNSUPERVISED ACCESS TO YOUNG STUDENTS EVERY SCHOOL DAY, AND ON MANY WEEKENDS, EVENINGS AND SCHOOL HOLIDAYS

47.     Schraufnagel's misconduct was made possible by the *carte blanche* that was irresponsibly granted to him by the District.

48.     During the relevant time period, Schraufnagel was granted complete autonomy by the District, and was subject to virtually no supervision or oversight.

49.     Schraufnagel scheduled classes for Stagecraft, one of the classes he taught, after school during weekdays, and every Saturday and Sunday. He routinely kept HGHS students in his office and in the school theater throughout the weekend, and into the night.

50.     There was no supervision of these weekend classes, which frequently extended from 9:30 a.m. to 11:00 p.m. on both Saturdays and Sundays.

51.     CCSD janitors were directed by Schraufnagel to steer clear of the theater department and refrain from cleaning the theater department area until late at night after the class disbanded.

52.     While HGHS students worked on productions until late at night, their parents were discouraged from entering the theater department.

53.     Upon information and belief, no CCSD administrators ever visited the theater department on a weekend to observe what was going on during the Stagecraft classes.

54.     During these sequestered weekend classes, Schraufnagel would occasionally direct his students to go off campus with him to the Quaker Hill Tavern, a bar/restaurant in

Chappaqua, where the teacher would drink alcoholic beverages with his meal in the presence of these minors.

## DEFENDANT SCHRAUFNAGEL'S BRAZENLY INAPPROPRIATE
## PUBLIC CONDUCT WAS IGNORED BY THE DISTRICT

55.     Clear signs that oversight over Schraufnagel was needed were repeatedly ignored by the CCSD administration.

56.     For example, Schraufnagel repeatedly insisted upon staging student theater productions with patently inappropriate content.

57.     In the spring of 2010, Schraufnagel directed HGHS students in a production of the play "*She Had Some Horses*".

58.     Prior to the performance of the play, HGHS Principal Andrew Selesnick was informed that it included an inappropriate orgy scene.

59.     Principal Selesnick determined that the scene was tasteful and should remain in the play.

60.     The orgy scene upset many members of the audience.

61.     In April of 2011, another play directed by Schraufnagel provided a clear indication that his sense of what was appropriate was impaired.

62.     The production of "*The Wedding Singer*" included a gratuitous scene in which Schraufnagel directed a student to engage in a striptease.

63.     The audience was notably disturbed by this highly inappropriate performance, and after the first night the scene was removed.

64.     Other plays selected by Schraufnagel to be performed at the high school included *Lysistrata* (January 2012), *Marat/Sade* (January 2013)*, and *Hair* (April 2015)*, each of which presented central themes of sex and drugs.

65.     In March 2012, the HGHS Theatre Repertory Company, under the direction of Schraufnagel, performed *Six Degrees of Separation* at the high school auditorium. The high school production included a scene in which two student actors, one playing a male prostitute, mimed the act of fellatio behind a screen.

66.     In November 2012, HGHS students under the direction of Schraufnagel performed the musical *Gypsy* at the high school. It featured numerous scantily clad students engaging in stripteases.

67.     In March 2013, the HGHS Theatre Repertory Company, under the direction of Schraufnagel, performed *Les Liaisons Dangereuses*, a play in which jaded adults psychologically and sexually corrupt minors.

68.     In May 2013, HGHS students, under the direction of Schraufnagel, performed *Psycho Beach Party* at the high school. A central character is a girl with multiple personality disorder; one of her persona is a dominatrix.

69.     These oddly lewd displays prompted no increased oversight or any other action by the District.

70.      In a CCSD newsletter article about the HGHS Theatre Repertory Company, Schraufnagel proclaimed, "I'm more drawn to the provocative; I think the students get more of an experience that way."

71.     Upon information and belief, a math teacher with a son in one of Schraufnagel's theater classes complained repeatedly to Schraufnagel regarding the sexually-charged language and imagery of these plays.

72.     Schraufnagel responded by taunting the teacher's son repeatedly and publicly, that, in words and effect, "your dad is giving me a hard time".

73.     Indeed, these inappropriate productions provoked repeated complaints from worried parents, who, upon information and belief, contacted school administrators to voice their concern that their children were being exposed to such sexualized material.

74.     Upon information and belief, complaints from the community were shared with Schraufnagel, who sneered at them and continued to cast his students, some as young as 14 years old, in sexually suggestive productions.

75.     Though the themes of Schraufnagel's productions persistently revolved around sexual display, amoral behavior and perversity, upon information and belief at no time did anyone in the District effectively investigate or respond to the teacher's repeated, strenuous efforts to scandalize the students and parents of Chappaqua.

### SCHRAUFNAGEL WAS PERMITTED TO ESTABLISH A CLOISTERED AND PERVERSE WORLD WHERE STUDENTS VIED FOR HIS APPROBATION WHILE THE ADMINISTRATION LOOKED AWAY

76.     At all times relevant to this claim, Schraufnagel engaged in outrageous misconduct with absolute impunity as the HGHS theater teacher and Performing Arts Department Chairperson, for which he was paid an additional stipend.

77.     Included in his responsibilities was the teaching of as many as three classes a semester, as well as directing multiple theater productions during each school year.

78.     Schraufnagel's students convened every day in his office, in his classes, and in the auditorium, where, encouraged by their teacher, they would openly discuss sexual practices, and drug and alcohol abuse.

79.     Schraufnagel's office, known to students as the "Schrauffice," was housed within a wing of HGHS that included the auditorium and four classrooms.

80.     The "Schrauffice" was a pivotal social hub, and the center of high school life for Schraufnagel's many student acolytes, most but not all of whom were in theater classes or in the Theatre Repertory Company.

81.     Unlike the Commons, the cafeteria, the library, or the courtyard of the high school, where many HGHS students hung out during free periods, the Schrauffice was a sequestered area where the initiated were encouraged to spend as much time as possible with their predatory teacher.

82.     The Schrauffice was regularly crammed with as many as 12 or more students at a time, who spent every lunch period and free class in the cramped room; some even cut classes to be there.

83.     Special education aides periodically brought their disabled student charges to the Schrauffice and left them there, under the mistaken impression that Schraufnagel would provide a welcoming atmosphere for these students.

84.     Schraufnagel was displeased by the disabled students' presence, and complained bitterly to his regular protégés that they were unwanted.

85.     There were rarely any adults in the theater wing of HGHS other than Defendant Schraufnagel, and music teachers Maureen Callam, H. Davis Knobloch and Raymond Lucia.

86.     These high school teachers repeatedly walked through groups of theater students *en route* to their classrooms.

87.     As the teachers walked through the groups of students, they were exposed to repeated, open discussions about drugs and sexual activities; the students also injected obscenities into their conversations as much as possible.

13

88.     The content and tone of these repeated discussions clearly demonstrated a need for appropriate investigation and adult supervision.

89.     Administrators, excepting occasionally Assistant Principals Michelle Glenn and Michael Taylor, steered clear of the area, leaving Schraufnagel to provide a depraved version of mentorship to the students who congregated there.

90.     In the theater department bathroom, students regularly inhaled drugs such as Adderall.

91.     Students occasionally performed in Schraufnagel's plays inebriated and under the influence of illegal drugs.

92.     In fact, on one occasion, when John Roe told Schraufnagel in his office that he was feeling anxious, the teacher gave him a tablet of the prescription tranquilizer, Klonopin. At another time, he gave John Roe six of these tablets.

93.     During classes, Schraufnagel would routinely treat his students to stories of his days as a drug dealer in New York City.  He bragged, for example, that he made special blends of the prescription drug Ketamine and other illegal substances to produce a recreational drug that he sold to club-goers.

94.     Schraufnagel instructed his students as to how to smoke marijuana at HGHS; all they needed to do was to go behind the building to a spot that he had designated as safe.

95.     Schraufnagel repeatedly drank alcohol at school, at times with students, and carried a flask with him in a gym bag.

96.     Schraufnagel was arrested on a Driving While Intoxicated ("DWI") charge in Yonkers on November 30, 2013 after leaving a Friends of Greeley Theater fundraiser in Armonk. New York.

97.    Schraufnagel's driver's license was suspended for 90 days.

98.    During the time period that his license was suspended, he was driven between the HGHS and the train station in Chappaqua by a team of students, openly entering and leaving students' cars in front of the school several times a day.

99.    Schraufnagel frequently spoke explicitly about sexual matters during class and to the children assembled in his office.

100.    For example, on a number of occasions he told his classes about an experience he had had as a little boy.  He stated that he went to a friend's house, where his friend's older brother displayed his genitalia wrapped in Saran Wrap and proceeded to rape a sleeping toddler.

101.    On another occasion he told his class that he slept with an old man who had a "wrinkly ass"; Schraufnagel observed to his students that the man should work out more.

102.    He spoke constantly to the students about which of his male students he thought were "cute", who had the largest genitalia, and who in his classes engaged in sexual activity with whom.

103.    Schraufnagel constantly prodded his students for details of the sex lives of his male homosexual students.

104.    Schraufnagel periodically selected one of the homosexual male students in the theater group as his appointed "proto-gay", a play on the word protégé.

105.    He regaled the students with tales of a former student who could ejaculate across the room.

106.    He forced the children in his classes to conceive of themselves as sexual beings, whether they were ready to do so, or not.

107.    Schraufnagel used harsh, sexualized language to harass HGHS students in a variety of ways, which created a harassing, hostile and sexually charged atmosphere.

108.    He repeatedly identified and publicly ridiculed one student for what he claimed was his excessively large posterior.

109.    He repeatedly, and publicly, labeled as homosexual several students who self-identified as straight.

110.    The outrageous conduct of Schraufnagel includes, without limitation, routinely having sexually explicit conversations with his students, providing his students, including John Roe, with alcohol and cocaine, and illegal prescription drugs such as Klonopin, and compelling his students to engage in sadistic and abusive "games".

111.    These games included "Trainwreck" which required students to share their real or created illicit drug histories.

112.    At his direction, they played "Sick Secret Santa" in which students were encouraged to shoplift gifts or make them out of ingredients such as pubic hair, semen or feces.

113.    The product of those games, such as puppets and voodoo dolls crowned with wigs constructed of pubic hair, lined the shelves in Schraufnagel's office at HGHS, visible to the casual observer.

114.    Students were encouraged by Schraufnagel to vie with one another in sharing their sexual exploits and drug-related endeavors. Outrageousness was encouraged and rewarded by his approbation.

115.    Students regularly utilized the catwalk above the auditorium stage to engage in sexual activity, which they then recounted to Schraufnagel and their classmates.

116.    This wanton, destructive subculture was enabled by the indifference of the CCSD.

117.     Schraufnagel was frequently reviewed by HGHS students on "RateMyTeacher," a publicly accessible and widely known website that publishes anonymous teacher reviews.

118.     A public post dated June 14, 2004 reads, "Schrauf is that rare teacher that is as fun outside of class as he is in class. Don't be scared by his tantrums; it's just the diva in him shining through."

119.     A public postdated September 1, 2010 reads "I hate how he treats people makes me scared to take something I have been doing since I was 5 he should have been fired by now[.]"

120.     Another public post, dated September 20, 2010 states: "He is easy anyone can get with him.  He's helpful in the way that he'll always lend a hand (smiley face) he's as clear as crystal meth, and the most popular girl in school by far."

121.     These readily accessible postings on RateMyTeacher, which remain online to this date, apparently triggered no additional oversight of this teacher.

### FREQUENT FIELD TRIPS TO NEW YORK CITY
### WERE FUELED BY DRUGS AND ALCOHOL

122.     Schraufnagel organized numerous after school field trips to New York City theater productions which included John Roe and other students from the Theater Repertory Company during the 2010-2011, 2011-2012, and 2012-2013 school years.

123.     Schraufnagel conducted all the organizational meetings for the New York City field trips during school hours, on the school grounds of the Defendant CCSD.

124.     Tickets for these field trips were purchased by John Roe's parents directly from HGHS.

125.   These trips inevitably involved John Roe and other students drinking and taking drugs, often while travelling on the train from Chappaqua into the City, and with their teacher at dinner.

126.   No chaperones or adults other than Schraufnagel attended these outings, which were only available to HGHS students

127.   Between November and December 2012, Schraufnagel took his students to see *"Mies Julie"* at the St. Ann's Warehouse in Brooklyn. Before the performance, Schraufnagel gave cocaine to John Roe.

128.   During the 2012-2013 school years, there was one field trip to see "*Who's Afraid of Virginia Woolf?"* and another to see "*Sleep No More*".

129.   Schraufnagel and his students, including John Roe, drank alcohol and became inebriated during both of these outings.

130.   In the spring of 2013, Schraufnagel took the students to a production of Shakespeare in the Park at the Delacorte Theater in Central Park.

131.   During this trip, Schraufnagel ate "firecrackers", a form of edible marijuana snack, with John Roe and other students, some of whom became so intoxicated that they vomited and passed out from dehydration.

132.   The New York City theater field trips were an integrated component of the HGHS curriculum.  Schraufnagel led class-time discussions back at the high school about specifics, such as the production values, of the plays they had travelled to see.

133.   Schraufnagel's unfettered, wholly unsupervised access to his minor students at the empty high school on weekends, in New York City on weeknights, and abroad on holiday breaks, was permitted by the CCSD administration for years.

134.    Predictably, things went terribly wrong within the cloistered world of the HGHS performing arts department.

## THE FIRST SEXUAL ASSAULT

135.    It was at HGHS during one of the day-long Stagecraft classes over a weekend that Schraufnagel first sexually assaulted John Roe.

136.    This first sexual assault of John Roe occurred between May 1, 2011 and June 24, 2011, on the "catwalk" area above the auditorium, when Schraufnagel insisted that it was time for the 15-year-old to "hook up" with him.

137.    John Roe tried to stave off his advances, but the 36-year-old teacher insisted that it happen "now" and brought him to the catwalk above the HGHS theater stage.

138.    On the catwalk, Schraufnagel pushed John Roe to his knees and directed the frightened 15-year-old student to perform oral sex upon him. The two then rejoined the nearby students in the auditorium.

139.    After this assault, John Roe stayed away from Schraufnagel and the theater department for more than a week but then returned.

140.    Upon his return, Schraufnagel told him, in words and effect, "you are just like Student Y because he would go away sometimes, but always came back."

141.    Over the next two years, John Roe was involved in a coercive romantic and sexual relationship in which Schraufnagel dominated his thoughts, feelings and academic choices.

142.    As a control mechanism, Schraufnagel texted John Roe repeatedly every day and insisted that he respond to his texts immediately.

143.     Schraufnagel encouraged John Roe to hate his parents, and frequently insisted that he was the only adult able to "take care of him", in contrast to John Roe's own parents whom he characterized as uncaring and homophobic.

144.     Schraufnagel reported to John Roe that this was not his first relationship with a student.

145.     In fact, Schraufnagel reported to John Roe that he had had sex with several other HGHS students before him.

146.     For example, he stated that he had had sex with one HGHS student in the sound booth near in the auditorium on the day of the student's graduation in 2010.

## THE SECOND SEXUAL ASSAULT

147.     Between February 17, 2012 and February 25, 2012, when John Roe was 16 years old, Schraufnagel took him and approximately nine other HGHS theater students to Greece for a HGHS-sanctioned theater trip.

148.     The trip to Greece was planned by Schraufnagel with his theater students entirely during class time, on the premises of the high school, and was wholly integrated into the curriculum.

149.     In fact, the entire school year curriculum taught by Schraufnagel leading up and following the trip to Greece consisted of ancient Greek plays to prepare the students for what they would see in Greece and to enable them to reflect afterwards on what they had seen during this field trip.

150.     During this trip, Schraufnagel drank alcohol every night to the point of inebriation, and encouraged all of the students, including John Roe, to do so as well.

151.     One night during the trip to Greece, Schraufnagel instructed John Roe and another HGHS student to come to his hotel room.

152.     Schraufnagel plied both students with vodka, and they became inebriated.

153.     Schraufnagel pulled the other student's pants off of him, and performed oral sex on him. He then directed John Roe to do the same.

154.     John Roe complied, while Schraufnagel watched.

155.     When the other student left the hotel room, Schraufnagel urged John Roe to have sex with him.

156.     John Roe declined and left the hotel room.

157.     John Roe describes this event as the lowest moment of his life.

158.     The repeated sexual abuse to which John Roe was subjected by Schraufnagel was made possible by the pattern and practice of the CCSD, the Board of Education of the CCSD, Chambers, McKay, Selesnick, Rhodes, Cardellichio and Citarella (the "CCSD Defendants") of failing to exercise a minimal level of oversight over Schraufnagel's interactions with its students, failing to respond to clear notice that more scrutiny was needed, and of failing to train its employees and students as to when and how to report the sexual abuse of its students by one of its teachers to school district authorities.

159.     Indeed, the CCSD Defendants, with willful indifference to the safety of its students, permitted Schraufnagel to create a wholly unsupervised sphere of immunity within HGHS where he was free to subject his students to years of sexual abuse, drug and alcohol abuse and sexual harassment.

**JOHN ROE GRADUATED FROM HGHS BUT RETURNED**
**TO WORK FOR DEFENDANT SCHRAUFNAGEL**

160.    John Roe graduated from HGHS in June 2013 and matriculated at a prestigious college in the fall of 2013.

161.    Damaged from years of emotional and sexual abuse and still in Schraufnagel's thrall, he returned to HGHS to help direct theater productions in the spring of 2014 and 2015.

162.    These were paid positions, arranged under the aegis of BOCES and authorized by the CCSD.

163.    They were initiated by Schraufnagel, who enjoyed unfettered discretion to hire whomever he wished.

164.    During the 2014-2015 school year, John Roe determined that he could not continue at his college.

165.    Although he is a strong student, the lingering effects of years of sexual and emotional abuse by Schraufnagel left him unable to negotiate the social and interpersonal demands of the college.

166.    In the Spring of 2015, John Roe applied to transfer to an isolated and socially non-demanding college with an extremely small student body located in a remote area more than 25 miles over mountain passes from the nearest town.

167.    John Roe finds this school less socially threatening than his previous college.

**AFTER YEARS OF INACTION BY THE CCSD, JOHN ROE**
**FORCED DEFENDANT SCHRAUFNAGEL TO RESIGN**

168.    In the spring of 2015, John Roe returned to the CCSD to assist with the HGHS Theatre Repertory Company's SpringFest.

22

169.    John Roe's time away from the CCSD had provided him with perspective on the perverted and insular society Schraufnagel had been permitted to establish at the HGHS campus.

170.    In June of 2015, John Roe came to the realization that he had been sexually harassed and abused by Schraufnagel throughout his years as a HGHS student.

171.    In addition, he began to see indications that Schraufnagel's sexually predatory behavior was continuing unchecked towards other HGHS students.

172.    During his work on the SpringFest plays in 2015, John Roe repeatedly witnessed Schraufnagel's attempts to groom current HGHS students, and feared that they, too, were being subjected to sexual abuse.

173.    Schraufnagel discussed one younger student with John Roe during this time period, telling him, in words and effect, "he's the new you", which John Roe understood to mean that the teacher intended to develop that student into his newest "proto-gay".

174.    Horrified by his belief that more students would be subjected to the same abuse he had suffered for years, and lacking any confidence that the District would do anything to stop the pattern that they had long tolerated, the 19-year-old young man decided to take action to stop Schraufnagel from teaching.

175.    John Roe decided to confront the teacher in a public place, for safety reasons.

176.    John Roe initially intended to confront Schraufnagel on Wednesday, June 10, 2015, but delayed doing so when he learned that Schraufnagel was drunk at school during the school rehearsal. He feared confronting the teacher while he was in that state.

177.    The following afternoon, on Thursday, June 11, 2015, John Roe arranged to meet Schraufnagel at a restaurant in Pleasantville, Michael's, accompanied by his friend, former HGHS student Jane Roe.

178.     Shaking and crying, John Roe told the 40-year-old teacher that he was a pedophile and a monster, and asked him "how could you do this to me?"

179.     Schraufnagel ordered him to not "use that word [pedophile]", and insisted that "it was only you".

180.     John Roe told him that he was lying, and that he "would not let him to do this to anyone else."

181.     He demanded that Schraufnagel resign his teaching position or he would report him to the police.

182.     John Roe's aim was to ensure that Schraufnagel never again went near children, and never again worked in a school. He told him, in words and effect, "I will be watching you."

183.     Schraufnagel agreed to resign.

184.     The teacher complained that he "felt like he was losing his family", and then asked if they could remain friends and talk to one another. John Roe answered that he would never see him again.

185.     Schraufnagel left them and returned to the high school.

186.     Concerned about the welfare of Schraufnagel's current students, John Roe returned to Chappaqua and met with several of them.

187.     One student immediately confirmed that he had been abused.  He asked John Roe to come home with him to help him describe the abuse to his parents, which Roe agreed to do.

188.     Meanwhile, Schraufnagel told his students that he was resigning.  They were shocked by this news.

189.     The last night of CCSD's SpringFest, scheduled for June 12, 2015, was abruptly cancelled with no public explanation.

190.    On June 15, 2016, Schraufnagel went on paid leave from his position at the
CCSD.

191.    On June 16, 2015, John Roe reported the facts of his abuse by Schraufnagel to the
New Castle Police Department.

192.    On July 30, 2016, HGHS Principal Rhodes emailed John Roe's parents, asking to
meet with them.

193.    Principal Rhodes' email stated, "We started down the path we are all on because
of one person's bravery.  We have a real chance to ensure student safety and welfare going
forward."

194.    John Roe's parents declined to meet with Principal Rhodes.

195.    On September 4, 2016, Schraufnagel submitted his resignation, which was
accepted by the District.

### DEFENDANT SCHRAUFNAGEL IS ARRESTED

196.    On October 25, 2015, Schraufnagel was arrested by the New Castle Police
Department, and charged with one felony count of third-degree criminal sex act and six
misdemeanor counts: two of endangering the welfare of a child and four of third-degree sexual
abuse, based on the complaints of three victims.

197.    The criminal complaint stated, *inter alia*, that all of the three victims were 15 at
the time of the alleged misconduct.

198.    All of the criminal acts charged occurred at HGHS. The charged activity took
place from May 1, 2011 and June 5, 2015 at HGHS, and in connection with HGHS-sanctioned
school activities.

199.    According to the criminal complaint, "From May 1, 2011 to June 5, 2015, the Defendant, a former speech and drama teacher at HGHS in Chappaqua, New York, engaged in numerous instances of sexual assault, inappropriate sexual conduct and contact with a total of three underage students of the school." … "Between May 1, 2011, and June 24, 2011, the Defendant engaged in oral sexual conduct with a then fifteen-year-old student of the school inside the school." … "Between December 1, 2014, and December 25, 2014, the Defendant asked a student at HGHS at the time to participate in a slideshow kissing every student in one of Defendant's classes while the Defendant took pictures. The next day, another student of the Defendant was directed by the Defendant to have the same victim kiss additional male and female students while being photographed. Thereafter, the Defendant publicly displayed the slideshow to one of his classes full of students in an attempt to humiliate the students." … "Between October 1, 2014 and June 5, 2015, the Defendant had a number of instances of inappropriate conversations with strong sexual overtones and sexual contact with another student of the school."

200.    Schraufnagel was charged with one E Felony, which is a third-degree criminal sex act. It was described as follows: "Between May 1, 2011 and June 24, 2011, the Defendant engaged in oral sexual conduct with a then fifteen-year-old student of the school inside the school."

201.    That student was John Roe.

**PENDING NEW YORK STATE SUPREME COURT CASES BROUGHT BY STUDENTS AGAINST DEFENDANT SCHRAUFNAGEL AND THE CCSD**

202.    There are currently multiple civil cases and court applications concerning six minor HGHS students pending in New York Supreme Court regarding Schraufnagel's misconduct, including Anonymous Student #4 *et al.* v. Chappaqua Central School District *et al.*,

Index No. 057576/2016; J.L. *et al.* v. Chappaqua Central School District *et al.,* Index No. 060109/2016, and Mary Doe *et al.* v. Chappaqua Central School District *et al.,* Index No. 61489/2016.

### THE CCSD DEFENDANTS RECEIVED NOTICE OF SCHRAUFNAGEL'S ABUSE OF STUDENTS ON AT LEAST TWO OCCASIONS

203.    In one of the state cases filed in New York Supreme Court, entitled Mary Doe, *et al.* v. Chappaqua Central School District, *et al.*, Index No. 61489/2016, the child's mother has submitted a sworn affidavit which includes the following allegation: "Principal Rhodes also informed me that in 2011 there were accusations made about Mr. Schraufnagel similarly abusing a student at HGHS.  I understand that rather than referring those allegations to the police department the Chappaqua Central School District chose to keep it quiet and do their own investigation.  We are not privy to the scope of that investigation or to the findings.  However, we do know that no actions were taken against Mr. Schraufnagel between 2011 and 2015."

204.    In addition, in or about the late fall of 2011, Schraufnagel told John Roe that he was worried about a legal problem involving an HGHS student.

205.    Either of these reports of misconduct by Schraufnagel against his students should have prompted an investigation. There is no indication that the CCSD Defendants conducted an effective investigation or took any remedial action on the basis of their awareness of the sexual abuse might have occurred.

206.    Had the District properly conducted a minimally competent investigation of either of these complaints, John Roe could have been spared the two instances of sexual abuse and years of emotional abuse to which he was subjected by Schraufnagel.

207.    Upon information and belief, multiple CCSD students had been abused by Schraufnagel by the time John Roe was first assaulted.

208.     Schraufnagel continued his perverted, unfettered reign at HGHS until John Roe forced him to stop.

## THE CCSD DEFENDANTS FAILED TO PROMULGATE A TITLE IX POLICY THAT WAS IN COMPLIANCE WITH THE TITLE IX STATUTE

209.     On information and belief, no one at the CCSD ever provided John Roe, his fellow students, or teachers and staff at the school with any training on the scope or purpose of Title IX, information regarding appropriate behavior by CCSD teachers towards their students, training on how this teacher's behavior constituted sexual and emotional harassment, or information on how to report harassing behavior.

210.     No one at the CCSD ever formally or informally provided John Roe the name or contact information of any Title IX Compliance Officer, or any other individual responsible for addressing claims of harassment at the CCSD.

211.     Upon information and belief, the CCSD and its Board of Education have never promulgated a Title IX policy which adequately complies with the Title IX statute.

212.     The CCSD's Title IX policy, as promulgated by the CCSD Board of Education was last revised in 1991.

213.     The CCSD Title IX policy fails to describe in any fashion what Title IX is, and does not offer any means for redress of a Title IX violation.

214.     The CCSD Defendants failed to promulgate a Title IX policy that was in compliance with Title IX's requirements regarding notice, training and procedures for a prompt and equitable response to complaints of sexual harassment and sexual assault.

215.     The CCSD Defendants displayed deliberate indifference to the safety of their students by failing to provide the training or guidance that is obviously necessary for implementation of a specific program or policy in compliance with Title IX.

## CHAPPAQUA RESPONDS TO THE SCANDAL

216.    This scandal has roiled the hamlet of Chappaqua and engendered a wide range of responses from the community.

217.    For example, New Castle Town Supervisor Robert Greenstein, when asked about the Schraufnagel case at a town forum, stated, "The schools are our biggest industry.  Whether you have kids in the schools or not, that's what maintains our property values.  We need to be there to support [the schools] and not get in the way."

218.    One day after Schraufnagel's resignation, the Defendant CCSD accepted a proposal from a Manhattan-based public relations firm Marathon Strategies, which included advice to "consider how it will explain to the media, parents and students that it acted swiftly and responsibly to the allegations and demonstrate that student safety is its top priority."

219.    The CCSD hired Marathon Strategies at rate of $15,500.00 per month.

### FIRST CAUSE OF ACTION:
### AGAINST DEFENDANT SCHRAUFNAGEL FOR
### VIOLATION OF 42 U.S.C. § 1983 – THE RIGHT TO BODILY INTEGRITY

220.    Plaintiff repeats and realleges paragraphs 1 through 219, above.

221.    Defendant Schraufnagel, acting under color of state law violated John Roe's right to bodily integrity as guaranteed by the Fourteenth Amendment to the United States Constitution by subjecting him to repeated instances of sexual harassment and sexual abuse within the school building and during a school-sanctioned field trip.

222.    Schraufnagel further violated John Roe's right to bodily integrity while acting under color of state law by repeatedly providing the minor with narcotics, prescription drugs and alcohol and encouraging John Roe to take said intoxicants in school and during school-sanctioned activities.

223.     As a direct and proximate result of Defendant Schraufnagel's actions, Plaintiff suffered damages, including without limitation emotional trauma, mental anguish and suffering, impairment of reputation, and personal humiliation.

**SECOND CAUSE OF ACTION:**
**AGAINST DEFENDANT SCHRAUFNAGEL FOR VIOLATION OF**
**42 U.S.C. § 1983 – THE RIGHT TO EQUAL PROTECTION OF THE LAW**

224.     Plaintiff repeats and realleges paragraphs 1 through 223, above.

225.     Schraufnagel, acting under color of state law, treated John Roe, a homosexual student, differently than his heterosexual or perceived to be heterosexual students.

226.     Schraufnagel targeted, groomed, sexually harassed and sexually abused John Roe based on John Roe's perceived sexual orientation.

227.     Schraufnagel violated John Roe's right to attend public school free of sexual harassment and sexual abuse.

228.     Schraufnagel violated John Roe's right to be treated equally to the students that the teacher perceived to be heterosexuals, as guaranteed by the Fourteenth Amendment to the United States Constitution.

229.     As a direct and proximate result of Defendant Schraufnagel's actions, Plaintiff suffered damages, including without limitation emotional trauma, mental anguish and suffering, impairment of reputation, and personal humiliation.

**THIRD CAUSE OF ACTION:**
**AGAINST CCSD DEFENDANTS FOR VIOLATION OF 42 U.S.C. § 1983 –**
**RIGHT TO BODILY INTEGRITY – FAILURE TO SUPERVISE**

230.     Plaintiff repeats and realleges paragraphs 1 through 229.

231.     The CCSD, Board of Education of CCSD, Chambers, McKay, Selesnick, Rhodes, Cardellichio and Citarella, (the "CCSD Defendants"), in their individual and official capacities,

acting under color of state law, violated John Roe's right to bodily integrity as guaranteed by the Fourteenth Amendment to the United States Constitution.

232.     The CCSD Defendants' custom and practice of failing to supervise Defendant Schraufnagel in his interactions with students proximately caused John Roe's injuries.

233.     The CCSD Defendants wholly abnegated their responsibility to exercise appropriate supervision of Defendant Schraufnagel in his interactions with their minor students.

234.     Despite indications that supervision was required, the CCSD Defendants failed to respond with the oversight required by common sense and minimal concern for the welfare of their students.

235.     The CCSD Defendants' inadequate supervision of Defendant Schraufnagel in his interaction with HGHS students, and with John Roe, constitutes deliberate indifference to the right of John Roe to maintain his bodily integrity as a student at HGHS as guaranteed by the Fourteenth Amendment of the United States Constitution.

## FOURTH CAUSE OF ACTION:
## AGAINST CCSD DEFENDANTS FOR VIOLATION OF 42 U.S.C. § 1983 –
## RIGHT TO BODILY INTEGRITY - FAILURE TO TRAIN

236.     Plaintiff repeats and realleges paragraphs 1 through 235, above.

237.     The CCSD Defendants, acting under color of state law, violated John Roe's right to bodily integrity as guaranteed by the Fourteenth Amendment of the United States Constitution.

238.     The CCSD Defendants' custom and practice of failing to train its staff and students as set forth below proximately caused John Roe's injuries.

239.     The CCSD Defendants failed to train its staff at HGHS to recognize and report on clear indications that Defendant Schraufnagel was engaging in inappropriate conduct and needed additional oversight in his interactions with students.

240.     The CCSD Defendants failed to train its students to recognize and report on abusive, inappropriate conduct by adult staff against them.

241.     By failing, as a custom and practice, to train both staff and students as to how to recognize and report sexual harassment and sexual abuse of students by teachers to District authorities, the CCSD Defendants acted with deliberate indifference to John Roe's right to attend public school with his bodily integrity intact as guaranteed by the Fourteenth Amendment to the United States Constitution.

242.     As a direct and proximate result of the CCSD Defendants' actions, Plaintiff suffered damages, including without limitation emotional trauma, mental anguish and suffering, impairment of reputation, and personal humiliation.

## FIFTH CAUSE OF ACTION:
## AGAINST CCSD DEFENDANTS – FOR VIOLATION OF 42 U.S.C. § 1983
## RIGHT TO BODILY INTEGRITY –FAILURE TO INVESTIGATE

243.     Plaintiff repeats and realleges paragraphs 1 through 242, above.

244.     The CCSD Defendants, acting under color of state law, violated John Roe's right to bodily integrity as guaranteed by the Fourteenth Amendment to the United State Constitution by failing to investigate earlier reports that Schraufnagel behaved inappropriately with his students.

245.     In or about the late fall of 2011, Schraufnagel told John Roe that he was worried about a legal problem involving an HGHS student.

246.    In addition, in a recent affidavit filed in a New York State Supreme Court case arising out of Schraufnagel's sexual abuse of students, it is alleged by a parent of an HGHS student that the current HGHS Principal notified her that in 2011 there had been accusations made about Schraufnagel similarly abusing another student at the high school.

247.    Had either or both of these reports of misconduct been competently investigated, Schraufnagel's widespread, chronic abuse of his students would have been discovered and stopped.

248.    Instead, the CCSD Defendants, with willful indifference to the rights of its students to attend public school free of sexual harassment, exposure to drugs and alcohol and sexual abuse, failed to properly investigate the claims of Schraufnagel's misconduct.

249.    The CCSD Defendants' failure to investigate claims of Schraufnagel's misconduct with his students proximately caused the years of sexual harassment and abuse that John Roe suffered at the hands of Defendant Schraufnagel, in violation of his right to bodily integrity as guaranteed by the Fourteenth Amendment to the United States Constitution.

250.    As a direct and proximate result of the CCSD Defendants' actions and inactions, Plaintiff suffered damages, including without limitation, emotional trauma, mental anguish and suffering, impairment of reputation and humiliation.

### SIXTH CAUSE OF ACTION:
### AGAINST THE CCSD DEFENDANTS: FOR VIOLATION OF 42 U.S.C. § 1983
### RIGHT TO EQUAL PROTECTION OF THE LAW

251.    Plaintiff repeats and realleges paragraphs 1 through 250, above.

252.    Defendant Schraufnagel was widely known to be homosexual by the CCSD community.

33

253.    The CCSD Defendants, acting under color of state law, adopted a custom and practice of referring students it perceived as homosexual to Schraufnagel for classes, counsel and support.

254.    This custom and practice subjected homosexual and perceived to be homosexual students, including John Roe, to different treatment than that accorded to heterosexual and perceived to be heterosexual students.

255.    This custom was repeated over the course of years and practiced by the CCSD Defendants who were or are municipal policy makers, including Defendants CCSD Board of Education, Interim Superintendent Chambers, Superintendent McKay, Principal Selesnick, Principal Rhodes, and Title IX Compliance Officers Citarella, Cardellichio, and Selesnick,

256.    Having funneled these homosexual and perceived to be homosexual students to Schraufnagel, the CCSD Defendants then, as a matter of custom and practice, utterly failed to exercise the most minimal level of supervision and scrutiny of Schraufnagel's conduct, despite repeated indications that supervision was necessary.

257.    The CCSD Defendants permitted Schraufnagel unparalleled control over and access to his students, including weekend-long classes without any other adults present, trips to New York City with no chaperones, and trips overseas with inadequate supervision.

258.    As a result of these practices, homosexual or perceived to be homosexual students, including John Roe, were rendered uniquely vulnerable to Schraufnagel's predations.

259.    As a direct and proximate result of the CCSD Defendants' actions, Plaintiff suffered damages, including without limitation emotional trauma, mental anguish and suffering, impairment of reputation, and personal humiliation.

**SEVENTH CAUSE OF ACTION:**
**AGAINST THE CCSD AND THE CCSD BOARD OF EDUCATION**
**FOR VIOLATION OF JOHN ROE'S RIGHTS UNDER TITLE IX**

260.     Plaintiff repeats and realleges paragraphs 1 through 259, above.

261.     The CCSD is a recipient of federal funding under Title IX.

262.     From in or about September 1, 2003 through and including on or about September 2015, CCSD employed Schraufnagel as a speech and theater teacher.

263.     Schraufnagel harassed Plaintiff based on his sex by, without limitation, subjecting Plaintiff to sexual comments, pressure and abuse.

264.     Schraufnagel's sexual harassment of Plaintiff was sufficiently severe and pervasive to create what a reasonable person would consider a hostile environment in the CCSD.

265.     Schraufnagel's sexual harassment of Plaintiff undermined and detracted from Plaintiff's equal access to the CCSD's institutional resources and/or opportunities.  Furthermore, Schraufnagel's harassment had a concrete, negative effect on Plaintiff's ability to participate in CCSD's educational opportunities.

266.     Plaintiff in fact found the environment created by Schraufnagel's sexual harassment to be hostile and abusive.

267.     The CCSD Defendants had actual notice of Schraufnagel's sexual harassment by virtue of the 2011 complaint reported by Rhodes, which included allegations of Schraufnagel similarly abusing a student.

268.     Upon information and belief, further actual notice had been provided by a prior legal issue concerning Schraufnagel and a HGHS student.

269.     The CCSD Defendants, as recipients of Title IX funds, had a duty to deter the risk of further sexual harassment by Schraufnagel.

270.     The CCSD Defendants had the authority to implement corrective measures and policies on behalf of CCSD.

271.     The CCSD Defendants acted with deliberate indifference to the harassment by, without limitation, failing to sufficiently investigate repeated episodes of sexual harassment and to take adequate measures, such as adopting appropriate policies, to stop future such misconduct against its students.

272.     As a direct and proximate result of the CCSD Defendants' actions, Plaintiff suffered damages, including without limitation emotional trauma, mental anguish and suffering, impairment of reputation, personal humiliation, embarrassment, anxiety, medical costs, economic loss and alienation both academically and socially from school activities.

**WHEREFORE**, Plaintiff prays that judgment be entered:

I.        On the First Cause of Action, under 42 U.S.C. § 1983, awarding Plaintiff damages in an amount to be determined at trial, including without limitation, compensatory damages, punitive damages, damages due to emotional distress, attorney's fees and reasonable costs;

II.       On the Second Cause of Action, under 42 U.S.C. § 1983, awarding Plaintiff damages in amount to be determined at trial, including without limitation, compensatory damages, punitive damages, damages due to emotional distress, attorney's fees and reasonable costs;

III.      On the Third Cause of Action, under 42 U.S.C. § 1983, awarding Plaintiff damages in amount to be determined at trial, including without limitation, compensatory damages, damages due to emotional distress, attorney's fees and reasonable costs;

IV.     On the Fourth Cause of Action, under 42 U.S.C. § 1983, awarding Plaintiff damages in amount to be determined at trial, including without limitation, compensatory damages, damages due to emotional distress, attorney's fees and reasonable costs;

V.      On the Fifth Cause of Action, under 42 U.S.C. § 1983, awarding Plaintiff damages in amount to be determined at trial, including without limitation, compensatory damages, damages due to emotional distress, attorney's fees and reasonable costs;

VI.     On the Sixth Cause of Action, under 42 U.S.C. § 1983, awarding Plaintiff damages in amount to be determined at trial, including without limitation, compensatory damages, damages due to emotional distress, attorney's fees and reasonable costs;

VII.    On the Seventh Cause of Action, under Title IX, awarding Plaintiff damages in amount to be determined at trial, including without limitation, compensatory damages, damages due to emotional distress, attorney's fees and reasonable costs;

VIII.   On the above stated causes of action, awarding the Plaintiff prejudgment interest, costs and such other further relief as this Court deems appropriate.

Dated:  Armonk, New York
        September 12, 2016

ASHER, GAUGHRAN LLP


By: _____/s/_____
            Julie Gaughran (JG 6790)
            Asher, Gaughran LLP
            4 MacDonald Avenue
            Armonk, New York 10504
            (914) 273-3187